**ALBERT Y. DAYAN**     80-02 Kew Gardens Rd., # 902, Kew Gardens, N.Y. 11415
Attorney at Law          Tel: (718) 268-9400:    Fax: (718) 268-9404

November 3, 2015

The Honorable Sandra L. Townes
United States District Judge
Easter District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    RE:    United States v. Mayer Gindi
             Case No. 11-cr-347

Dear Judge Townes:

    Based upon the PSR, it appears that the Government's theory of the bankruptcy fraud charge is based upon the March 2009 bankruptcy petition filed by Tri-State Investment Assets ("**Tri-State**") "in which the defendant made numerous false statements for the purpose of preventing creditors from taking legal title to two properties that had previously been owned by Tri-State." PSR p. 6, ¶16. The PSR also states that the bankruptcy filing occurred after the sheriff sale. PSR, ¶17. It then says that, "as a result of the bankruptcy filing, the bankruptcy court reversed the foreclosure sale and the defendant retained title to the properties." PSR, ¶18. I examined the docket of the March 19 bankruptcy filing, a copy of which is annexed hereto in its entirety as Exhibit A. There is no evidence to support this statement. There is no order of the Bankruptcy Court reversing any sheriff sale. The case was dismissed on June 30, three months after filing.

11/3/2015
Page 2

      Although Tri-State filed a motion to reopen the bankruptcy case, that motion was not granted. The docket does refer to the filing of another case, number 09-34841. That docket report is annexed as Exhibit B. Again, there is no evidence of the Bankruptcy Court reversing a sheriff sale. In fact, in neither case is there any motion filed by a mortgagee to obtain relief from the automatic stay to allow the continuance of a foreclosure proceeding. Upon the filing of a bankruptcy petition, a stay of pending litigation takes effect automatically, hence the sobriquet "automatic stay." A mortgagee whose efforts to foreclose have been stayed must file a motion to obtain relief from the stay. See 11 U.S.C. 362 (a) and (d). From what I understand, these motions are made everyday in bankruptcy courts across the country. If the bankruptcy filing in fact impeded the creditors, one would have expected them to file a motion in the bankruptcy court for relief from the automatic stay, seeking to continue their foreclosure proceedings. No such motions were filed. Moreover, Based upon the PSR, It appears erroneously that the sheriff sale occurred prior to any of the bankruptcy filings. The statement in paragraph of the PSR that "the bankruptcy court reversed the foreclosure sale" is undeniably not accurate. There was no reversal of any sheriff sale.

      The Prosecutor's claim, that the rightful owners could not collect at least $70,000.00 in rental payments on the properties rent on these properties had the defendant not filed for bankruptcy, is also unsubstantiated. As is illustrated in Exhibit "C", there was a rent receivership assigned to the properties as of November 5th, 2007. But, even assuming the future owner did sustain some loss to revenue, it was the Defendant's lawful right to file for Bankruptcy in an attempt to hold on to the properties.

      As has been extensively briefed in Defendant's underlying motion, there is no causal nexus between the failure to answer question 4 of the *Statement of Financial Affairs* and any loss

of rental income suffered by the mortgagee. It does not appear from the docket of the bankruptcy case that the foreclosure was impeded. The mortgagee had available it the very quotidian remedy of filing a motion for relief from the stay if it deemed it necessary. The fact that no such motions were filed in either case belies the allegation that the loss of rental income was caused by the failure to answer question 4. It is difficult to understand how the Government could allege that this omission was intentional, because the omission in and of itself had no impact upon the foreclosure proceeding. Why would the Defendant lie when the lie would serve no purpose, inimical or benign? The Defendant had nothing to gain by failing to disclose the prior foreclosure. Indeed, the statement that the Bankruptcy Court reversed the sheriff sale suggests that it was aware of the prior foreclosure proceeding. These contradictions in the PSR, the fact that the sheriff sale had occurred pre- bankruptcy, the lack of any nexus between damage to the mortgagee and the alleged "fraudulent statement," lead to the conclusion that Mr. Gindi should never have pleaded guilty to the charge of bankruptcy fraud. So why did he plead guilty to a crime that did not exist?

To answer this question, Your Honor's attention is respectfully directed to defendant's allocution at page 29 line 18 through page 30 line 7.

"THE COURT: All right. Okay. With respect to the second count, the bankruptcy fraud, tell me what you did there. THE DEFENDANT: When I filed the bankruptcy papers, I did it myself. I went down to the courthouse. I didn't have that much time. I left out –you know, I left out the-- MR. KAYE: Excuse me for a moment. THE DEFENDANT; One second (Counsel and defendant confer.) THE DEFENDANT: I filed the bankruptcy papers and one of the questions was, did I know of any litigation against my company in the past 12 months, and I knowingly signed off no on it knowing that there was a litigation against the company."

On the specific subject of the Bankruptcy filing during his plea allocution, Defendant was attempting to explain something to the Court before his lawyer interjected and made sure that defendant would utter the words that satisfy the elements of the statute. But rather than challenge his allocution on factual basis, Meyer Gindi challenges his conviction on legal grounds of *materiality and erroneous legal advice on the law.* If he were properly advised he would not have pleaded guilty, not because he is necessarily innocent but because his conduct did not violate the law. He pleaded guilty not knowing the law.

Under the current laws when a motion to withdraw a plea "is made, the court may set aside the judgment of conviction and permit the withdrawal of the plea only to correct manifest injustice." The courts have universally defined a manifest injustice as a "factual basis" State v. Yates, 169 Vt. 20, 28 (1999). Unfortunately, judicial equities are threatened by the mistakes of prior counsel. The colloquy at the plea-hearing highlight the confusion and ultimate ineffective assistance of counsel. Defendant was motivated by advice received from counsel, which fell short of competent. See, Hill v. Lockhart, 474 U.S. 52, 88 L.Ed.2d 203, 106 S.Ct 366 (1985) A criminal defendant's plea of guilty may be attacked on the ground that the defendant's counsel did not provide the defendant with reasonably competent advice." Cuyler v. Sullivan, 446 U.S. 335, 64 L.Ed.2d 333, 100 S.Ct. 1708 1980. Clearly defense counsel's incorrect legal advice rose to level of ineffective assistance of counsel and induced this defendant's plea thereby rendering it involuntary and unintelligent.

Mr. Gindi's plea of guilty to a crime that did not exist, compounded with Prosecutor's lack in knowledge of the bankruptcy laws and procedure, lack in knowledge as to why Mr. Gindi filed for bankruptcy when he did, lack in knowledge as to why he pleaded guilty to Bankruptcy fraud if in fact he was not and why he is now moving to withdraw the plea of guilty, lack in knowledge of facts surrounding Mr. Gindi's many other real estate transactions on his own and

11/3/2015
Page 5

with Sammy, obliged them to call him a liar and a career cheat whose only motive is to delay sentencing. The facts of this case and his other many real estate transactions, however, demonstrate that the Prosecutor's theory in this case is wrong.

At the outset, Government's theory that "Specifically, the defendant asked an individual named Sammy Shaker to recruit individuals to purchase properties owned by the defendant, knowing these individuals had no intention of living at the properties or making mortgage payments" is not completely accurate. After a long real estate business relationship with Sammy, where Defendant had lost a lot of money, please see Exhibit 'E'. Sammy proposed a scheme to Gindi where he would provide purchasers for properties owned by Gindi unrelated to any other deals they worked on in the past. Mr. Gindi, who had never done anything similar in many years of real estate business and was on the verge of ruin, reluctantly agreed. It was Sammy who introduced the idea to Meyer, not the other way around.

Further, the statement that "…in an attempt to abuse the bankruptcy process so as to prevent creditors from taking title to his properties, the defendant falsified filings with the United States Bankruptcy Court", ("PSR" Par.,2), is absolutely wrong in fact and in common sense. It's wrong in fact because no Bankruptcy petition was ever filed by Defendant in connection to any properties that he had dealt with Sammy. And it is wrong in common sense because Gindi would have no use for filing for Bankruptcy after the property had been transferred to a third party and Gindi would have been in receipt of the sale price. The two purchased properties in the name of Tri-State Investments Assets LLC ("Tri-State"), which were subject of the Bankruptcy petition, had absolutely nothing to do with the deals introduced to Meyer by Sammy and had nothing to do with straw purchasers. Moreover, notwithstanding the Prosecution's assertion that "…defendant, however, failed to make single payment on the loans used to purchase these properties and, in turn, the properties were foreclosed upon the creditors, is also wrong. Meyer Gindi did make

11/3/2015
Page 6

payments for at least 18 months on 218 Academy Bank Mortgaged property and at least $50.000.00 in payments on the vacant lot of land mortgaged by a private "hard money lender" before going into default. While Gindi was financially struggling and in default on the parcel of land, an investor who wanted to squeeze Gindi out of the property purchased the note from the hard money lander assuming all of the risks associated with the current default. In the process of pushing Meyer out of the property, Meyer filed for Bankruptcy. It was a shark eat shark business situation. Gindi's initial Bankruptcy petition, filed in his absence by an attorney, initially sought to prevent an Energy Company from cutting off electricity to his Ice Cream Shop, which had approximately $16.000.00 in arrears. Two weeks after, Gindi personally filed a corrected petition seeking a stay on the Electricity cut off and at the same time stay the foreclosure on the properties he was hoping to salvage. It is true that he wanted to gain time before the property would be completely lost. But there was no underlying intent to defraud any one. The dates of the Ice Cream store going into default and the foreclosure on the property were parallel due to financial hardships that he had encountered at that same time.

    The Bankruptcy petition did not inquire as to whether petitioner had any property sold at a foreclosure sale, as is alleged by play on words by the prosecution memorandum in at Page 2, Paragraph 2. It specifically asked for lawsuit history. Gindi did omit indicating being involved in a lawsuit. But, whether intentional or unintentional the omission was immaterial. In the February 19, 2015 meeting with the Government, Gindi did attempt to clarify for the Agent that at the time of his petition for bankruptcy he knew he was in "foreclosure" not "litigation". Mayer Gindi denies saying that "he was being sued in New Jersey" during the meeting with the agent. Gindi was not using the words "suing" and "foreclosure" loosely and interchangeably as did the Government in their Memo. During the same meeting with the Government, Gindi did inform prosecution that he filed for bankruptcy initially because the ice cream store he owned was

failing. After being pressed on the subject, he confirmed that he had a controlling partner in the store. But non-the-less, Gindi maintained that was also the owner. "After further questioning," Gindi admitted that he knew that the second bankruptcy filing would disrupt his creditor's plans to foreclose on the properties. When Gindi met with the Prosecutor and Agent in this case, he attempted to clarify for them the sequence of events and his state of mind at the time of the occurrences at issue here. Despite the twist on words in Government's memo, Meyer Gindi never changed his story, as is alleged by the Government here.

    It is respectfully submitted that, if at this juncture Gindi does not choose to proceed to withdraw his plea of guilty on factual basis, but rather on legal grounds, is no indication that he "changed his story" as is alleged by the Government memo.

    To lend credence to the Government's position, that Gindi has been disingenuous through out his litigation process, prosecutions attempts to boot strap testimony he gave in connection to his brother's appeal for resentencing. In that case Mayer Gindi testified in a proceeding before the Honorable Kiyo A Matsumoto and the Government in that case specifically indicated that Meyer Gindi had absolutely no connection the frauds associated with his brother except for the introduction of the government operative to Isaac Gindi by Mayer Gindi after Meyer Gindi had refused – *despite numerous attempts to induce Mayer by the Government operative* -- to be engaged in any other fraudulent real estate activity. Based upon information and belief, the issue at the hearing where Meyer testified in, was the defendants mother's ability to take care of herself if Isaac Gindi was to be incarcerated and a conflict in representation of both Gindis by a single prior counsel. Please See Exhibit "D". It was another crucial mistake by his attorney to allow Mayer Gindi to testify in an unrelated matter while himself under Indictment.

    For all of the above reasons, Mayer Gindi did not ever intend to be dilatory with his own case as is suggested by the prosecution. His only wish, before being sentenced, was to be heard.

11/3/2015
Page 8

Consistent with the well-established principles of law the defendant herein prior defense counsel's incorrect legal advice clearly induced defendant's plea and paved the way to this application. This reviewing court is given broad discretion to determine if the plea was entered voluntarily, knowingly and intelligently. People v. Alexander, 97 N.Y.2d 482, 743 N.Y.S.2d 45 2002.

For all of the above, it is respectfully requested that Your Honor not be effected by the name calling as is exercised by the prosecution in this case, but to evaluate the numerous, tangled and not readily visible facts of this case in sentencing Mayer Gindi accordingly.

Respectfully submitted,

*Albert Y. Dayan*
ALBERT Y. DAYAN, ESQ.